**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| AMY MICHELLE RAISLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 12-606 |
| | ) | Judge Nora Barry Fischer |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

## I.     INTRODUCTION

Amy Michelle Raisley ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 404-434 and 1381-1383f ("Act"). The record has been developed at the administrative level, and the parties have brought cross-motions for summary judgment. For the following reasons, the Court finds that the decision of the Administrative Law Judge ("ALJ") is not supported by substantial evidence. Accordingly, Defendant's Motion for Summary Judgment (Docket No. 19) is DENIED and Plaintiff's Motion for Summary Judgment (Docket No. 17) is GRANTED insofar as it seeks a vacation of the administrative decision under review and REMANDED to the Commissioner.

## II.     PROCEDURAL HISTORY

Plaintiff applied for DIB on February 7, 2010, alleging physical impairments with a disability onset date of January 1, 2009. (R. at 26-27; 42; 64).[1] She subsequently filed for SSI on May 14, 2010, providing the same allegations. (R. at 129). Following the initial denial of her applications on March 29, 2010 (R. at 37-41), Plaintiff requested a hearing by an Administrative Law Judge on May 10, 2010 (R. at 36). On September 24, 2010, a hearing was held before an ALJ at which Plaintiff and a vocational expert appeared and testified. (R. at 21-25; 430-468). The ALJ issued his unfavorable decision to Plaintiff on December 23, 2010. (R. at 9-20). Plaintiff filed a request for review by the Appeals Council on August 6, 2011 (R. at 128-35), which was denied on March 10, 2012 , thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 5-8).

Having exhausted all administrative remedies, Plaintiff filed her Complaint in this Court on May 8, 2012. (Docket No. 4). On July 20, 2012, Defendant filed his Answer. (Docket No. 5). Thereafter, Plaintiff filed her Motion for Summary Judgment with a supporting brief on October 22, 2012. (Docket Nos. 17, 18). Defendant filed his cross-motion and supporting brief on November 7, 2012. (Docket Nos. 19, 20).

## III. FACTS

### A. General Background

In her self-report, Plaintiff listed the physical conditions limiting her ability to work as: migraines/sinus headaches/headaches; arthritis; mitral valve prolapse[2]; leaky valve[3]; high blood

---

[1]    Citations to ECF Nos., the Record, *hereinafter,* "R at ___."

[2]    Mitral valve prolapse is "the most common heart valve abnormality" and means that the material preventing the backflow of blood between the left valve and atrium of the heart is flawed. It may allow the backflow of blood and, in serious cases, can lead to heart failure or abnormal heart rhythms. Though some patients experience symptoms, others never realize they have this condition. MedicineNet.com, Mitral Valve Prolapse (MVP), *available at* http://www.medicinenet.com/mitral_valve_prolapse/article.htm.

[3]    A leaky valve is a "condition in which the blood flow is altered by a valve that allows blood to flow backwards, otherwise known as regurgitation." Healthcentral.com, What is a Leaky Valve, *available at* http://www.healthcentral.com/heart-disease/c/45112/60623/questions-dr.

pressure/hypertension[4]; severe Raynaud's syndrome[5]; and allergies. (R. at 72). She does not use illicit drugs or abuse alcohol and tobacco. (R. at 304). Her current list of medications includes Amlodipine Besylate[6], Atenolol[7], Avapro[8], Ciprofloxacin[9], Imitrex[10], Prednisone[11], and Topomax[12]. (R. at 76). The date on which she was last insured was June 30, 2010. (R. at 68).

---

[4] "High blood pressure; transitory or sustained elevation of systemic arterial blood pressure to a level likely to induce cardiovascular damage or other adverse consequences." STEDMAN'S MEDICAL DICTIONARY 927 (28th ed. 2006).

[5] Raynaud's syndrome (or Raynaud's disease or phenomenon) "is a condition that causes some areas of your body, such as your fingers, toes, the tip of your nose and your ears, to feel numb and cool in response to cold temperatures or stress. In Raynaud's disease, smaller arteries that supply blood to your skin narrow, limiting blood circulation to affected areas." Mayo Clinic, Raynaud's Disease, *available at* http://www.mayoclinic.com/health/raynauds-disease/DS00433/.

[6] Amlodipine Besylate Amlodipine "belongs to a class of medications called calcium channel blockers. These medications block the transport of calcium into the smooth muscle cells lining the coronary arteries and other arteries of the body." "By relaxing coronary arteries, amlodipine is useful in preventing chest pain (angina) resulting from coronary artery spasm. Relaxing the muscles lining the arteries of the rest of the body lowers the blood pressure, which reduces the burden on the heart as it pumps blood to the body." MedicineNet.com, Amlodipine, Norvasc, *available at* http://www.medicinenet.com/amlodipine/article.htm.

[7] Atenolol "is a beta-adrenergic blocking agent that blocks the effects of adrenergic drugs, for example, adrenaline or epinephrine, on nerves of the sympathetic nervous system. One of the important functions of beta-adrenergic stimulation is to stimulate the heart to beat more rapidly. By blocking the stimulation of these nerves, atenolol reduces the heart rate and is useful in treating abnormally rapid heart rhythms. Atenolol also reduces the force of contraction of heart muscle and lowers blood pressure. By reducing the heart rate, the force of muscle contraction, and the blood pressure against which the heart must pump, atenolol reduces the work of heart muscle and the need of the muscle for oxygen." MedicineNet.com, Atenolol, Ternormin, *available at* http://www.medicinenet.com/atenolol/article.htm.

[8] Avapro "is an oral medication that is used to treat high blood pressure (hypertension) and diabetic nephropathy or kidney disease." MedicineNet.com, irbesartan (Avapro), *available at* http://www.medicinenet.com/irbesartan/article.htm.

[9] Ciprofloxacin "is an antibiotic that is used to treat bacterial infections. Ciprofloxacin stops the multiplication of bacteria by inhibiting the reproduction and repair of their genetic material (DNA)." MedicineNet.com, ciprofloxacin, Cipro, Cipro XR, Proquin XR, *available at* http://www.medicinenet.com/ciprofloxacin/article.htm.

[10] Sumatriptan (Imitrex) "is a drug that is used for treating migraine headaches." "Migraine headaches are believed to result from dilatation of blood vessels in the brain. Sumatriptan relieves migraines by stimulating serotonin receptors in the brain which cause the muscles surrounding the blood vessels in the brain to contract and narrow the blood vessels. At the same time, it also reduces transmission of pain signals by nerves to the brain. While it is very effective in relieving migraine headaches, it does not prevent or reduce the number of headaches." MedicineNet.com, sumatriptan, Imitrex, Alsuma, *available at* http://www.medicinenet.com/sumatriptan/article.htm.

[11] Prednisone "is an oral, synthetic (man-made) corticosteroid used for suppressing the immune system and inflammation." "Corticosteroids have many effects on the body, but they most often are used for their potent anti-inflammatory effects, particularly in those conditions in which the immune system plays an important role. Such conditions include arthritis, colitis, asthma, bronchitis, certain skin rashes, and allergic or inflammatory conditions of the nose and eyes." MedicineNet.com, prednisone, Deltasone, Liquid Pred, *available at* http://www.medicinenet.com/prednisone/article.htm.

[12] Topomax "is an oral drug that is used to prevent the seizures of epilepsy… Topiramate also prevents migraine headaches." MedicineNet.com, Topiramate Topomax, *available at* http://www.medicinenet.com/topiramate/article.htm.

Plaintiff was born on December 28, 1977, and was thirty-two years old at the time of her hearing. (R. at 64; 429). She is 5'4" and weighs approximately 126 lbs. (R. at 72). She is an only child and resides at her family home in Butler, Pennsylvania with her mother. (R. at 260; 428). She had been engaged, but her fiancé passed away on September 9, 2008. (R. at 106; 260). Two months later, her father died at the age of 62 due to diabetes and cancer, which was soon followed by her grandfather's death. (*Id*.). Plaintiff was diagnosed with mild arthritis and Raynaud's Syndrome around late 2004. (R. at 77; 81). She claims that she suffers from extreme fatigue, weakness, lightheadedness, pain, and discomfort "all of the time," and describes the combination of these symptoms as a "super power working against" her. (*Id*.).

Plaintiff describes herself as someone who has "always worked very hard" and an "extremely dedicated" student and employee while she was in school and in the workforce. (R. at 81). Plaintiff's highest level of education is some college education, having received an A.A.S. in Early Childhood Education. (*Id*.). Although she went back to school with the intent of obtaining a Bachelor's degree in Elementary Education, she did not continue past December 2005. (R. at 73; 81). She claims that in seeking employment at this point, she encountered "lots of shut doors," although the reason for that is unspecified. (*Id*.). In October 2006, Plaintiff began working as a preschool teacher, which was her last job. (R. at 81). When her migraines and Raynaud's Syndrome progressed to the point that they began to limit her functioning, she "still kept pressing on." (*Id*.). Due to her sensitivity to the cold, Plaintiff obtained permission from her employer to stay inside during the winter, rather than go outside with the children; as "a trade-off" for another coworker going outside in her place, she would stay inside and clean or prepare lunch for the children. (R. at 111-12). According to Plaintiff, she was further limited by lightheadedness, blurry vision, and fatigue. (*Id*.). She adds that coworkers "often told" her that

her face was red and asked if she "felt ok," as she would become unpredictably lightheaded, even without physical activity and "during story time." (*Id*.). She claims that she became unable to remember things, including where she placed objects and instructions from her employer. (*Id*.). When this happened, her boss would end up completing these tasks for her. (*Id*.). Thus, her increased difficulty functioning both at work and at home caused Plaintiff to reduce her hours at work around January 2009 until she stopped working completely in late January 2010. (R. at 73; 81; 439-41).

Plaintiff does have her driver's license and can drive a car. (R. at 441-42). However, she claims that she began using a disabled parking permit during the winter months around 2005 due to severe deterioration of the circulation in her hands and feet as a result of Raynaud's Syndrome. (R. at 77; 112). Plaintiff states that "lately" she has been unable to leave the house alone, as a result of her "extreme fatigue," which makes her "so weary" sometimes that she cannot drive. (R. at 103). When she goes grocery shopping she tries to get everything she needs in one day, which takes approximately an hour and a half, one time per week. (R. at 103).

In her self-report, Plaintiff admitted to being able to clean, do laundry, vacuum, check oil and fluid levels on her car, and engage in some general yard work, although this activity makes her face "hot" and she sweats profusely. (R. at 102). Plaintiff cannot mow the lawn due to her severe grass allergy and the small tasks that she used to be able to complete in an hour and a half now take her three (3) hours or longer; she is unable to do other yard work at all. (R. at 111). She does laundry and tries to "tidy up" her bathroom and bedroom once a week, but she claims that this also takes twice as long as it used to. (*Id*.). Plaintiff no longer vacuums because she becomes red-faced and overtired. (*Id*.). Although she cares for her two cats, on days that she is too "cloudy" or "weak," her mother completes this task for her. (R. at 101, 107). She estimated that

she could lift a child weighing a maximum of ten (10) or twenty-five (25) lbs., although she will feel her blood pressure and heart rate begin to spike, and that she could walk approximately 500 feet before resting, as long as she is not lightheaded and the temperature is warm enough. (R. at 105). She believed that she could pay attention for as little as ten (10) minutes. (*Id.*).

Plaintiff claims that she remains fatigued throughout the day, regardless of whether she has had a good night's sleep the night before. (R. at 100). On a typical day, Plaintiff prepares a simple breakfast and lunch for herself, as long as it is something that "does not require a lot of energy" because, she says, "I simply don't have it." (R. at 77; 102). She is unable to prepare an "adequate meal" because she is too weak and fatigued. (R. at 110). She spends the morning sorting mail, preparing bills to be mailed, and balancing her checkbook before preparing a light lunch. (*Id.*). She claims that as the day progresses, her energy level continues to decrease, and she will "either read or sometimes lay back down." (*Id.*). By then, it is time for dinner, which her mother either brings home or prepares for her. (*Id.*). After dinner, she typically returns phone calls or emails friends and family before bed. (*Id.*). She has a number of friends with whom she socializes, though in-person interactions have been limited since the onset of her conditions. (R. at 106). Plaintiff claims to get along with authority figures well, describing herself as "easy going" and able to get along with "anybody." (*Id.*).

Plaintiff is a self-described "Firebird and Camaro enthusiast," and her hobbies include watching the television show, "CSI: Miami" once a week; listening to music; singing; and baking, although at this point she cannot do much more than watch television because she is too weak, fatigued, cloudy, and lightheaded. (R. at 104). She took pride in her abilities with respect to her previous hobbies, describing herself as a "perfectionist," noting that she never gave up these activities by choice but that she was too limited to perform at the level she once did. (*Id.*).

Although she used to be "quite the baker," she has stopped doing so since the onset of her condition. (R. at 102). Exercise used to be a "big part" of her life, but increasing fatigue over the five years preceding her application caused her to reduce her hour-and-a-half daily routine to fifteen (15) to thirty (30) minutes on a treadmill until she had stopped completely by the time of her application. (R. at 107).

Plaintiff describes experiencing pain from migraines and headaches on a daily basis. (R. at 108). She is also consistently uncomfortable, primarily due to her Raynaud's, which causes her weakness and extreme fatigue, regardless of whether she sleeps. (R. at 108). She notes that at one point, a registered nurse compared her to a corpse because of the severity of her Raynaud's symptoms. (R. at 108). She is extremely sensitive to hot and cold temperatures, and her hands and feet can become so cold that she is unable to fall asleep. (R. at 107). She describes sleeping under four blankets while wearing pajamas and socks. (R. at 111). She further states that she cannot endure exposure to cold temperatures since her hands are "cold as ice all of the time," and hot water can make them turn "lobster red" and go numb, causing her fingers to crack and bleed. (R. at 112). According to Plaintiff, she suffers from the limitations described in her self-report on a daily basis, and her condition is "constant, consistent," and without change. (R. at 108).

### B. Medical History

Plaintiff's earliest relevant medical records commence in January 2008, beginning with a "sick visit" to her primary care physician ("PCP"), Dr. John R. Rocchi, M.D. of Primary Care Associates of Butler, located in Butler, Pennsylvania. (R. at 248-49). That day, Plaintiff presented to Dr. Rocchi's office with a sore throat, chest and sinus congestion, a cough, and pink eye. (*Id*.). The record indicates that Dr. Rocchi had previously treated Plaintiff for

conjunctivitis[13], as he wrote that she had pink eye "again" and needed a "new" prescription. (*Id*.).

Upon examination, Plaintiff was also diagnosed with maxillary sinusitis[14]. (*Id*.). Plaintiff's

"Problem List" included acute bronchitis, acute maxillary sinusitis, and Raynaud's Syndrome.

(*Id*.). Plaintiff returned to see Dr. Rocchi on March 17, 2008, complaining of a headache with

pressure in her cheeks and the sides of her nose, accompanied by "a lot [of] vomiting" the

previous day, as well as sinus congestion and pressure. (R. at 245-46). Plaintiff speculated that

she might have had food poisoning. (*Id*.). However, Dr. Rocchi found that Plaintiff had left

maxillary sinus tenderness and diagnosed her with a sinusitis, which he treated with Avelox[15] for

ten (10) days. (R. at 246). He noted that Plaintiff "[h]as had recurrent infections," and decided to

refer her to an ear, nose, and throat ("ENT") specialist for further evaluation. (*Id*.).

On May 27, 2008, Plaintiff saw Dr. Rocchi for another sick visit, presenting with

laryngitis, sore throat, chest and sinus congestion, an earache and clogged ears, and feeling

"hot." (R. at 242). Upon examination, Dr. Rocchi diagnosed Plaintiff with allergies and again

placed her on Xyzal[16] and Avelox. (R. at 243). Two weeks later, on June 10, 2008, Plaintiff went

to the emergency room of Butler Memorial Hospital, where Dr. James B. Minshull treated her

for sinus pressure, head pain, a nosebleed, and feeling cold and clammy. (R. at 196-203). Her

blood pressure was recorded as 169/92. (*Id*.). Dr. Minshull ordered a CT scan of her head and

---

[13]      Conjunctivitis is "inflammation of the conjunctiva." STEDMAN'S MEDICAL DICTIONARY 430 (28th ed. 2006).The conjunctiva is "the mucous membrane investing the anterior surface of the eyeball and the posterior surface of the lids." *Id*. at 430.

[14]      Sinusitis is "inflammation of the mucous membrane of any sinus, especially the paranasal. STEDMAN'S MEDICAL DICTIONARY 1777 (28th ed. 2006). Maxillary sinuses are "the largest of the paranasal sinuses occupying the body of the maxilla, communicating with the middle meatus of the nose. *Id*. at 1776.

[15]      Avelox "is a fluoroquinolone antibiotic that kills sensitive bacteria by stopping the production of essential proteins needed by the bacteria to survive." Drugs.com, Avelox, *available at* http://www.drugs.com/misspellings/avalox.html.

[16]      Xyzal "(Levocetirizine) is used to relieve runny nose; sneezing; and redness, itching, and tearing of the eyes caused by hay fever, seasonal allergies, and allergies to other substances such as dust mites, animal dander, and mold. It is also used to treat symptoms of hives, including itching and rash." PubMed Health, Xyzal (Levocetirizine), *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000405/.

sinuses. (R. at 190-92). The results of Plaintiff's head CT returned normal, but the scan of her

sinuses revealed moderate pan sinusitis. (*Id*.). Plaintiff's next recorded visit to Dr. Rocchi was on

November 4, 2008, when she again complained of a sore throat, sinus congestion, with pain and

fullness in her ears, and a cough, fevers, and chills. (R. at 239). Dr. Rocchi diagnosed her with

acute pharyngitis[17] and placed her on Zithromax[18]. (R. at 240). She underwent a CT scan of her

paranasal sinuses on March 27, 2009 as a follow-up to that of June 10, 2008, which revealed

"very mild chronic sinusitis." (R. at 188). The impression was given as "significantly improved

compared to the prior study." (*Id*.).

Thereafter, Plaintiff visited Dr. Rocchi on April 9, 2009, at which time she complained of

being sick "all the time," stuffiness, and having constant pressure in her head. (R. at 234). Dr.

Rocchi's notes indicate that Plaintiff had seen an ENT, "Dr. Pollice," who believed that she

needed to have sinus surgery. (*Id*.). However, as Dr. Pollice no longer performed the surgery

himself, he referred her to another specialist. (*Id*.). Plaintiff then saw Dr. James Blaumgrund,

who apparently did not want to perform the surgery, though there is no explanation in the record.

(*Id*.). Dr. Rocchi noted that Plaintiff was "very upset" at being unable to avail herself of surgical

relief, and that she suffered from daily sinus problems, including yellow and green drainage.

(*Id*.). He wrote that Plaintiff was "constantly sick and is missing a lot of work." (*Id*.). He reported

that she had begun to receive allergy shots the previous summer, but that they did not help. (*Id*.).

Having diagnosed her with chronic rhinosinusitis[19], Dr. Rocchi indicated that he would refer

Plaintiff to an allergist "for repeat allergy testing" and to "another ENT for possible surgery." (R.

[17]     Pharyngitis is "inflammation of the mucous membrane and underlying parts of the pharynx." STEDMAN'S
MEDICAL DICTIONARY 1473 (28th ed. 2006).
[18]     A Zithromax Z-Pak, or azithromycin, is "a macrolide antibiotic" that "fights bacteria in the body" and "is
used to treat many different types of infections caused by bacteria, such as respiratory infections, skin infections, ear
infections, and sexually transmitted diseases." Drugs.com, Zithromax Z-Pak, *available at*
http://www.drugs.com/mtm/zithromax-z-pak.html.
[19]     Rhinosinusitus is"[i]nflammation of the mucous membrane of the nose and paranasal sinuses." STEDMAN'S
MEDICAL DICTIONARY 1691 (28th ed. 2006).

at 235). Her "Problem List" that day included acute bronchitis, acute maxillary sinusitis, Raynaud's Syndrome, allergic rhinitis, cellulitis, and chronic sinusitis. (*Id.*).

On July 9, 2009, Plaintiff returned to see Dr. Rocchi regarding her headaches. (R. at 231). At this visit, Plaintiff complained that her headaches were "getting worse," and that she was "taking more Imitrex than usual," although they had not been as bad in the past week. (*Id.*). Dr. Rocchi reported that Plaintiff's headaches "have been worse lately," and that she had needed to take ten (10) Imitrex pills within a fourteen (14) day period. (*Id.*). He wrote that Plaintiff typically only suffered migraines during her menstrual cycle, but that more recently, she had been experiencing them other times as well. (*Id.*). Dr. Rocchi stated that Plaintiff's headaches were "throbbing" with "a pulsating behind her eyes," that Plaintiff "vomits with them," and that Imitrex "doesn't always help" if she did not take it at the onset of a headache. (*Id.*). Dr. Rocchi referred Plaintiff for an MRI/MRA of her brain, and added the prescriptions of Pamelor (Nortriptyline HCL)[20] and Treximet[21] to take at night, in addition to the Imitrex. (R. at 232). Subsequently, Plaintiff underwent an MRI and MRA of her brain, without contrast, on July 17, 2008. (R. at 178-81). Both results were normal, although the MRA impression was "not well visualized." (*Id.*). Plaintiff returned to see Dr. Rocchi on August 31, 2009 for a physical examination and to discuss the results of her MRI. (R. at 227-30). She reported that she was "still having headaches," which were "not any better," although the Treximet and Imitrex were helpful. (*Id.*). Dr. Rocchi noted that she had not filled the prescription for Pamelor "due to

---

[20]     Pamelor (Nortriptyline) "is used to treat depression. Nortriptyline is in a group of medications called tricyclic antidepressants. It works by increasing the amounts of certain natural substances in the brain that are needed to maintain mental balance. Nortriptyline comes as a capsule and an oral liquid to take by mouth." PubMed Health, Pamelor (Nortriptyline), *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000732/.

[21]     Treximet "is a tablet containing a combination of sumatriptan and naproxen. Sumatriptan is a headache medicine. It is believed to work by narrowing the blood vessels around the brain. Naproxen is in a group of drugs called nonsteroidal anti-inflammatory drugs (NSAIDs). Naproxen works by reducing hormones that cause inflammation and pain in the body. Treximet is used to treat migraine headaches." Drugs.com, Treximet, *available at* http://www.drugs.com/treximet.html.

concerns over side effects," and he decided to try Topamax (Topiramate) instead, instructing her to follow up in several weeks. (*Id.*).

A week later, on September 6, 2009, Plaintiff, accompanied by her mother, appeared at Med Express in Mars, Pennsylvania for treatment of a sinus infection. (R. at 137-41). Upon examination, Plaintiff was found to have arrhythmia. (*Id.*). An EKG was taken of Plaintiff's chest and was abnormal, showing sinus tachycardia[22] and abnormal "precordial QRS contours." (*Id.*). The examining physician, "Dr. Coloros," recommended that she go to the emergency room, and Plaintiff agreed to have her mother drive her. (*Id.*). When Plaintiff presented at the Butler Memorial Hospital ER, she reported suffering from anxiety and not being able to sleep. (R. at 153-54). Her initial pulse rate was recorded as 148, but one (1) hour later it had decreased to 88. (*Id.*). Dr. David N. Benado, M.D. treated Plaintiff with 50 mg of Atenolol[23] and 500 mg of Ciprofloxacin[24], and ordered a CBC with Diff[25], a Comprehensive Metabolic 12[26], a Thyroid Stimulat[ing] Hormone[27], a Thyroxine (T4), and a T3, free. (R. at 155-67). After reviewing the

---

[22] "Rapid beating of the heart, conventionally applied to rates over 90 beats per minute." STEDMAN'S MEDICAL DICTIONARY 1931 (28th ed. 2006).

[23] Atenolol "is used alone or in combination with other medications to treat high blood pressure. It also is used to prevent angina (chest pain) and improve survival after a heart attack. Atenolol is in a class of medications called beta blockers. It works by relaxing blood vessels and slowing heart rate to improve blood flow and decrease blood pressure." PubMed Health, Atenolol, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000819/.

[24] Ciprofloxacin "is used to treat or prevent certain infections caused by bacteria." PubMed Health, Ciprofloxacin, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000878/.

[25] Complete Blood Count with Differential is one of the most commonly ordered tests for routine check-ups and/or physicals. A complete blood count with differential measures the levels of red blood cells, white blood cells, platelet levels, hemoglobin and hematocrit. Many times it is ordered as a screening test, as an anemia check or as a test for infection. HealthCheck, Complete Blood Count with Differential, *available at* http://www.healthcheckusa.com/Complete-Blood-Count-CBC-with-Differential/46853/.

[26] Also called a Comprehensive Metabolic Panel, this is a frequently ordered panel of tests, giving doctors information about a patient's kidneys, liver, electrolyte, acid/base balance, blood sugar and blood proteins. Lab Tests Online, Comprehensive Metabolic Panel, *available at* http://labtestsonline.org/understanding/analytes/cmp/tab/glance.

[27] "A thyroid-stimulating hormone (TSH) blood test is used to check for thyroid gland problems. TSH is produced when the hypothalamus releases a substance called thyrotropin-releasing hormone (TRH). TRH then triggers the pituitary gland to release TSH." "TSH causes the thyroid gland to make two hormones: triiodothyronine (T3) and thyroxine (T4). T3 and T4 help control your body's metabolism. This test may be done at the same time as tests to measure T3 and T4." WebMd, Thyroid-Stimulating Hormone (TSH), *available at* http://www.webmd.com/a-to-z-guides/thyroid-stimulating-hormone-tsh.

results of Plaintiff's labs, which were normal, Dr. Benado determined that her condition was "completely improved," diagnosing her with acute sinusitis, heart palpitations, and generalized anxiety, for which he prescribed Plaintiff a one-week supply (fourteen (14) pills) of Ciprofloxacin, instructing her to take one (1) by mouth twice a day for a week, and ten (10) 1 mg doses of Ativan (Lorazepam) [28] to take once every eight (8) hours as needed. (*Id*.). Plaintiff was discharged with instructions to follow up with Dr. Rocchi in a few days. (R. at 159).

Two days later, on September 8, 2009, Plaintiff followed up with Dr. Rocchi as instructed. (R. at 224). Here, she reported suffering from a fast heart rate, elevated blood pressure, pain in her right armpit area, difficulty sleeping, and stress. (*Id*.). Nevertheless, she remarked that she "did not realize that her heartbeat was that fast" at the time of the incident at Med Express, and claimed that she felt better and denied chest pains. (*Id*.). After Dr. Rocchi reviewed the blood work from the ER, he decided to place her on an event monitor[29] and to obtain "24 hour urine and blood for catecholamines"[30] and "metanephrines"[31]. (R. at 225). Plaintiff underwent the blood work on September 10, 2009, and returned to follow up with Dr. Rocchi regarding the results on September 21, less than two (2) weeks later. (R. at 168-71; 221). She claimed to experience "episodes of rapid heartbeat," although she did not notice them much, and she reported that her headaches had been less frequent. (R. at 221-23). According to Plaintiff, she had only noticed an increased heart rate once while wearing the heart monitor, and

---

[28]     Lorazepam (Ativan) "is used to relieve anxiety. Lorazepam is in a class of medications called benzodiazepines. It works by slowing activity in the brain to allow for relaxation." PubMed Health, Lorazepam, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000560/.

[29]     An event monitor records the heart's electrical activities. It is like an EKG, except it can monitor the heart during daily activities. National Heart Lung and Blood Institute, What are Holter and Event Monitors?, *available at* http://www.nhlbi.nih.gov/health/health-topics/topics/holt/.

[30]     "Pyrocatechols with an alkylamine side chain… major elements in response to stress." STEDMAN'S MEDICAL DICTIONARY 326 (28th ed. 2006).

[31]     "A catebolite of epinephrine found in the serum, urine and in some tissues." STEDMAN'S MEDICAL DICTIONARY 1194 (28th ed. 2006).

that her pulse was between 80 to 120 or 130. (*Id.*). Dr. Rocchi indicated that he would refer her to an endocrinologist[32] regarding the paroxysmal tachycardia. (*Id.*).

Dr. Rocchi referred Plaintiff to Dr. Oscar Castro, M.D. of Butler Regional Endocrinology, whom Plaintiff first saw on November 3, 2009. (R. at 304). Dr. Castro described Plaintiff as "a pleasant" thirty-one-year-old woman, who had been "experiencing significant stress lately because of a death in her family." (*Id.*). Plaintiff complained of headaches, insomnia, fatigue, and weakness, but denied increased perspiration, hand tremors, symptoms of anxiety, lack of concentration, and body malaise. (*Id.*). Dr. Castro found that her catecholamines and metanephrines were unremarkable and did not believe that she suffered from pheochromocytoma[33] or paraganglioma[34]. In sum, Dr. Castro opined that she was suffering migraine headaches and "significant stress," and referred her back to Dr. Rocchi for "migraine headache management." (R. at 305). He stated that he did not "necessarily need to see her back," but would be happy to should any future problems arise. (*Id.*).

Thereafter, Plaintiff followed up with Dr. Rocchi on November 23, 2009, at which time she reported having frequent headaches, which were pulsating and radiating down her neck. (R. at 218-20). Dr. Rocchi indicated that Pamelor did not provide Plaintiff with any relief, and she did not start on Topomax because of the side effects. (*Id.*). Dr. Rocchi diagnosed her with chronic headaches and referred her to neurology for further evaluation. (*Id.*). He continued her

---

[32]     Endocrinology is "the science and medical specialty concerned with the internal or hormonal secretions and their physiologic and pathologic relations." STEDMAN'S MEDICAL DICTIONARY 639 (28th ed. 2006).

[33]     "A functional chromoffinoma, usually benign, derived from adrenal medullary tissue cells and characterized by the secretion of catecholamines, resulting in hypertension, which may be paroxysmal and associated with attacks of palpitation, headache, nausea, dyspnea, anxiety, pallor and profuse sweating." STEDMAN'S MEDICAL DICTIONARY 1480 (28th ed. 2006).

[34]     "A small, rounded body containing chromaffin cells; a number of such bodies may be found retroperitoneally near the aorta and in organs." STEDMAN'S MEDICAL DICTIONARY 1418 (28th ed. 2006).

on Imitrex and decided to start her on low dose Inderal[35], instructing her to return in a few weeks. (*Id*.). When Plaintiff returned for another follow-up visit with Dr. Rocchi on December 11, 2009, she reported that she was to see a neurologist at the end of that month. (R. at 215-17). She had started on low dose Norvasc[36] the previous week, but had yet to notice a change in her headaches. (*Id*.).

On December 28, 2009, Plaintiff saw a neurologist, Dr. Munir Y. Elawar, M.D. of Elawar Neurology Associates in Butler, Pennsylvania, at which time she reported suffering from headaches for the past five (5) to six (6) years, which were located in the front and back of her head and the bridge of her nose, and occasionally behind her eyes. (R. at 146-47). She described the pain as dull, sharp pressure and throbbing, and rated it as a ten (10) out of ten (10) on the pain scale. (*Id*.). Although Plaintiff reported that the Imitrex and allergy shots had provided her with some relief, even calling Imitrex "a godsend," Dr. Elawar noted that the headaches "happen almost daily and can last from a few hours to several days," and that Plaintiff "wakes up just about every morning with a headache and pressure in her head." (*Id*.). Dr. Elawar further noted that Plaintiff "has vomiting, drowsiness and weakness every time," that light and noise made them worse, and that "[t]hings feel cloudy when they are full blown." (*Id*.). Plaintiff noticed that they occurred in conjunction with her menstrual cycle, and also tended to accompany sinus infections and high blood pressure. (*Id*.). Dr. Elawar opined that "[s]tress is a big factor" and that

---

[35]    Inderal (propranolol) "is used to treat high blood pressure, abnormal heart rhythms, heart disease, pheochromocytoma (tumor on a small gland near the kidneys), and certain types of tremor. It is also used to prevent angina (chest pain) and migraine headaches. Propranolol is also used to improve survival after a heart attack. Propranolol is in a class of medications called beta blockers. It works by relaxing blood vessels and slowing heart rate to improve blood flow and decrease blood pressure." PubMed Health, Propranolol, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000727/.

[36]    Norvasc (amlodipine) "is used alone or in combination with other medications to treat high blood pressure and chest pain (angina). Amlodipine is in a class of medications called calcium channel blockers. It lowers blood pressure by relaxing the blood vessels so the heart does not have to pump as hard. It controls chest pain by increasing the supply of blood to the heart. If taken regularly, amlodipine controls chest pain, but it does not stop chest pain once it starts." PubMed Health, Amlodipine, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000914/.

Plaintiff had been under "a lot of stress," given the recent death of her fiancé and her father two months later, followed by her grandfather. (*Id*.). Dr. Elawar noted that Plaintiff had a history of Raynaud's Syndrome, fast heart rate, chronic sinusitis, and a difficult menstrual cycle. (*Id*.). On the "Review of Systems," he reported that Plaintiff had fatigue, racing pulse and intolerance to heat or cold. (*Id*.). Dr. Elawar reviewed Plaintiff's previous lab tests, including the MRI of her brain, before diagnosing her with chronic migraine and Imitrex rebound headaches. (R. at 147). Dr. Elwar expressed his concern regarding Imitrex, "especially in view of the Raynaud's phenomenon and of the tachycardia[37]". (*Id*.). Thus, he ordered an echocardiogram and EKG, and added that Plaintiff would benefit from prophylactic treatment. (*Id*.). He prescribed Plaintiff 25 mg of Topamax taken daily, to be increased gradually to 75 mg. (*Id*.). Dr. Elawar stated that Plaintiff "is to cut back significantly on the Imitrex and is not to exceed six a month." (*Id*.). In two places in his notes from this visit, Dr. Elawar commented that he had discussed his concerns "in great detail" with Plaintiff and her mother, who had accompanied her to this visit and that he "had a very extensive discussion with [Plaintiff] and her mother regarding her condition." (*Id*.). Dr. Elawar instructed Plaintiff to have follow-up blood work in one (1) month and again in three (3) months, and to "keep us closely informed of any changes in her condition and of how she responds to the medication." (*Id*.). Finally, he told Plaintiff to follow up with him within three (3) months. (*Id*.).

The next day, on December 29, 2009, Plaintiff presented to Dr. Rocchi's practice, Primary Care Associates of Butler, but saw Dr. Thomas G. Shetter, M.D. instead of Dr. Rocchi. (R. at 212). She complained chiefly of sinus congestion and pressure, which had been ongoing

---

[37]     Tachycardia is a faster than normal heart rate. A healthy adult heart normally beats 60 to 100 times a minute when a person is at rest. If you have tachycardia (tak-ih-KAHR-de-uh), the rate in the upper chambers or lower chambers of the heart, or both, are increased significantly. Mayo Clinic, Tachycardia, *available at* http://www.mayoclinic.com/health/tachycardia/DS00929.

for approximately two (2) weeks, although she had finished a course of Zithromax the previous week. (*Id.*). Dr. Shetter diagnosed her with maxillary sinusitis and prescribed her a "full course" of Avelox, advising her to follow up with any problems or additional concerns. (R. at 213).

On January 8, 2010, Plaintiff appeared at the Heart and Vascular Center of Butler Memorial Hospital for the echocardiogram and EKG that Dr. Elawar had ordered. (R. at 148-49; 193-95; 279-88). The Echo Cardiography Report indicated tachycardia and a mild mitral valve prolapse and regurgitation[38]. (*Id.*). A few days later, on January 11, 2010, Plaintiff returned to Dr. Rocchi's office for an appointment to follow up on her appointment with Dr. Elawar. (R. at 209). Dr. Rocchi reiterated that Dr. Elawar had recommended starting Plaintiff on Topamax, but not until she had recovered from her sinus infection. (*Id.*). Apparently, Plaintiff had "restarted" allergy shots the previous week and was taking Claritin D. (R. at 210). However, Dr. Rocchi noted that she "needs to stop Claritin D," but could take "regular Claritin," and that she "need[s] to get back on injections regularly." (*Id.*). Dr. Rocchi added that Plaintiff was taking Norvasc and that "[h]er headaches aren't as intense as they were prior to starting it." (*Id.*).

On January 27, 2010, Plaintiff visited Dr. Rocchi for an extremely rapid heartbeat, which had occurred the previous evening from 9:00 p.m. until 5:00 a.m. that morning, as well as weakness and tiredness. (R. at 333). Plaintiff explained that her heart was "pounding hard and felt erratic," although she did not have chest pain. (*Id.*). Dr. Rocchi opined that Plaintiff "[h]as had intermittent tachycardia in the past but this is the worst episode that she has had." (*Id.*) He diagnosed her with hypertension and paroxysmal tachycardia, and increased her dose of Norvasc to 5 mg per day. (R. at 334). Additionally, Dr. Rocchi sent her for an EKG and referred her to a

---

[38]     "Mitral regurgitation is a disorder in which the heart valve that separates the upper and lower chambers on the left side of the heart does not close properly. Regurgitation means leaking from a valve that does not close all the way. Mitral regurgitation is the most common type of heart valve disorder." PubMed Health, Mitral Valve Regurgitation, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001228/.

cardiologist, Dr. Dean E. Wolz, M.D., for further evaluation. (*Id*.). As a final note, he wrote that he "[w]ill keep [Plaintiff] off work until this can be evaluated." (*Id*.).

Plaintiff saw Dr. Wolz the very next day, on January 28, 2010. (R. at 251-55). At this time, she reported that she was still working as a preschool teacher. (R. at 251). On her intake form, Plaintiff explained that she had been referred to Dr. Wolz for "extreme fatigue," "a high heart rate," and "no sleep." (*Id*.). In his letter to Dr. Rocchi following his appointment with Plaintiff, Dr. Wolz wrote that Plaintiff was there for "palpitations, tachycardia, fatigue, mitral valve disease, and systolic hypertension." (R. at 254). Dr. Wolz reported that Plaintiff "has had hypertension for the last year or so," and that she "has also had intercurrent symptoms of palpitations and fatigue," as well as "fairly extensive endocrinologic medical and neurologic work up." (*Id*.). However, the echocardiogram results were normal and she had no significant arrhythmia. (*Id*.). Dr. Wolz wrote that Plaintiff "feels exhausted all the time" and "does have difficulty getting through a full work day." (*Id*.). He added that her symptoms "have been worse over the past several weeks to months," and added that she "does have Raynaud's phenomenon" and that she "denies any significant lower extremity edema." (*Id*.). His plan was to rule out significant renal artery stenosis[39] as the cause of her hypertension and to place her on a trial of angiotensin receptor blocker[40], then to see Plaintiff back after 30 days of using a heart monitor. (R. at 255). Plaintiff had another echocardiogram that same day, which revealed tachycardia. (R. at 361-63).

---

[39]     Stenosis is "a stricture of any canal or orifice." STEDMAN'S MEDICAL DICTIONARY 1832 (28th ed. 2006).
[40]     "A family of peptides of known and similar sequence, with vasoconstrictive activity, produced by enzymatic action of renin on angiotensinogen." STEDMAN'S MEDICAL DICTIONARY 90 (28th ed. 2006).

Plaintiff followed up with Dr. Rocchi on February 22, 2010 to discuss her examination by Dr. Wolz. (R. at 330). Dr. Rocchi reported that Dr. Wolz had switched Plaintiff to Avapro[41] and that her blood pressure had improved, but her pulse was "still up." (*Id*.). Dr. Rocchi noted that Plaintiff was supposed to have had her follow-up visit with Dr. Wolz earlier that month, but had been forced to reschedule for March due to a snowstorm. (*Id*.). He opined that her hypertension was improved and continued her on Avapro. (R. at 331). However, he wrote that Plaintiff was "still tachycardic," and added that she "need[s] to get back into Dr. Wolz." (*Id*.). Although Plaintiff had earlier stated that she was to return to see Dr. Wolz in March, Dr. Rocchi noted that he would have his office call to get her an appointment. (*Id*.).

Plaintiff appeared at Butler Medical Associates to follow up on her 30-day event monitor on March 1, 2010. (R. at 273-74). She complained of continuous fatigue, and was diagnosed with a paroxysmal[42] atrial flutter[43], hypertension with slightly elevated diastolic blood pressure, Raynaud's phenomenon, and mild mitral valve prolapse and mitral regurgitation. (*Id.*). Thereafter, she was placed on Verapamil[44] and was referred to an electrophysiologist[45]. (*Id.*).

---

[41]    Avapro (Irbesartan) "is used alone or in combination with other medications to treat high blood pressure. It is also used to treat kidney disease caused by diabetes in patients with type 2 diabetes… Irbesartan is in a class of medications called angiotensin II receptor antagonists. It works by blocking the action of certain natural substances that tighten the blood vessels, allowing the blood to flow more smoothly and the heart to pump more efficiently." PubMed Health, Irbesartan *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001023/.

[42]    Paroxysm is "a sharp spasm or convulsion," or "a sudden onset of a symptom or disease, especially one with recurrent manifestations such as the chills and rigor of malaria." STEDMAN'S MEDICAL DICTIONARY 1427 (28th ed. 2006).

[43]    "Rapid regular atrial contractions occurring usually at rates between 250 and 330 per minute… and often producing 'sawtooth' waves in the electrocardiogram." STEDMAN'S MEDICAL DICTIONARY 749 (28th ed. 2006).

[44]    Verapamil "is used to treat high blood pressure and to control angina (chest pain). The immediate-release tablets are also used alone or with other medications to prevent and treat irregular heartbeats. Verapamil is in a class of medications called calcium-channel blockers. It works by relaxing the blood vessels so the heart does not have to pump as hard. It also increases the supply of blood and oxygen to the heart and slows electrical activity in the heart to control the heart rate." PubMed Health, Verapamil, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000818/.

[45]    Electrophysiology is "the branch of science concerned with electrical phenomena that are associated with physiologic processes." STEDMAN'S MEDICAL DICTIONARY 623 (28th ed. 2006).

A little over a week later, on March 9, 2010, Plaintiff saw Dr. Evan C. Adelstein, M.D., an electrophysiologist at the University of Pittsburgh Physicians Cardiovascular Institute. (R. at 259-61). In his letter to Dr. Wolz regarding Plaintiff's appointment, Dr. Adelstein wrote that Plaintiff was "a 32-year-old woman who has persistently elevated heart rates," and that she had told him that she had been experiencing "extreme fatigue" for the past year and a half. (R. at 259). He wrote that "[t]his has become progressively more debilitating," and added that Plaintiff had "increasingly cut back her hours to the point at which she had to stop working and file for disability." (*Id*.). He added that she was "barely able to accomplish her tasks of daily living." (*Id*.). With respect to her Raynaud's Syndrome, Dr. Adelstein wrote that Plaintiff is "unable to tolerate the cold weather because her hands and feet become extremely numb and painful," as well as her ears and toes. (*Id*). However, he found that there were only minor elevations in her results from testing, and her endocrinologist "was not concerned about either phenochromocytoma or hypo- or hyperthyroidism," though Dr. Adelstein did not have the results of Plaintiff's thyroid function tests. (*Id*.). He reviewed the results of the 30-day event monitor Dr. Wolz had prescribed and found that they "all show sinus tachycardia," although Plaintiff did not experience palpitations. (*Id*.). He found that her past medical history was significant for Raynaud's Syndrome, hypertension, and headaches. (*Id*.).

Dr. Adelstein opined that "[o]n exam, the patient is somewhat chronically ill appearing." (R. at 260). Her hands and ears were "somewhat dusky in color" and had "poor capillary refill." (*Id*.). While her ECG showed "normal sinus rhythm at 97 beats per minute," Dr. Adelstein added: "I should note that the heart rate did increase significantly just with going from the seated to lying position upon auscultation." (*Id*.). In his opinion, her sinus tachycardia was a secondary phenomenon to another condition. (*Id*.). Given Plaintiff's "multi systemic complaints,

particularly the Raynaud phenomenon," Dr. Adelstein suspected that she had a connective tissue disease that is undiagnosed. (*Id*.). He found that she did not seem to have "the CREST syndrome," but that "her condition warrants consultation with a rheumatologist[46]". (*Id*.). He added that he asked Plaintiff to be seen at Presbyterian Hospital by the rheumatology department there, "[g]iven the rare nature of these diseases." (*Id*.). He was unwilling to prescribe any medications to slow down her heart "until we know exactly what the underlying problem is." (*Id*.). He added that he was hesitant to prescribe her a beta-blocker or calcium channel blocker "since I believe the tachycardia is a secondary phenomenon." (*Id*.). Dr. Adelstein advised Plaintiff to increase her intake of non-caffeinated beverages and to switch to regular Claritin to avoid any tachycardia induced by the decongestant component. (*Id*.). However, he had no problem with Plaintiff continuing to receive allergy shots, "since she is at no greater increased risk from epinephrine-induced tachycardia than anyone else." (*Id*.). He deferred ordering more lab work, assuming that the rheumatologist would inevitably order additional work. (*Id*.). He stated that he "tried to impress upon Amy and her mother that the mild mitral valve prolapse and mild mitral regurgitation are of minimal concern at the present time," and that it "may be a manifestation of an underlying rheumatologic disease with myxomatous degeneration of the value." (*Id*.). He instructed Plaintiff to follow up in six (6) months to see if she had made any progress. (*Id*.).

On March 22, 2010, Plaintiff saw Dr. Rocchi for her four-week follow up visit. (R. at 327). That day, she reported feeling constantly "tired" and "drained," regardless of how much sleep she had the night before. (*Id*.). Dr. Rocchi reiterated the results of Plaintiff's appointment

---

[46]     Rheumatology is "the medical specialty concerned with the study, diagnosis, and treatment of rheumatic conditions." Rheumatism is an "indefinite term applied to various conditions with pain or other symptoms of articular origin or related to other elements of the musculoskeletal system." STEDMAN'S MEDICAL DICTIONARY 1689 (28th ed. 2006).

with Dr. Adelstein, noting that she would be seeing a rheumatologist in June. (*Id*.). He remarked that she "continues to have red/purplish fingers and toes," which "go numb and burn when it is cold outside." (*Id*.). Although Plaintiff reported sleeping up to eight (8) hours per night, "when she wakes up she does not feel refreshed," and sometimes "comes close to falling asleep during the day." (*Id*.). Dr. Rocchi decided to schedule a sleep study and blood work for further evaluation regarding Plaintiff's fatigue. (R. at 328). He also referred her to "Dr. Mitra," a rheumatologist, for evaluation regarding her Raynaud's. (*Id*.). Plaintiff had her blood work completed that day. (R. at 339-45). Plaintiff returned to see Dr. Rocchi on April 22, 2010, complaining of feeling tired and that both of her feet turned black two nights earlier. (R. at 322). However, she did not go to the ER because she felt that Butler Memorial Hospital "brushes her off when she goes there" (*Id*.). Dr. Rocchi wrote that although Plaintiff's headaches "haven't been as bad recently," she "continues to have color changes in fingers and toes," and "her feet got very dark several nights ago." (*Id*.). Dr. Rocchi remarked that Plaintiff was to see Dr. Mitra in May, and he reported that he had "[s]tressed to her that it is important to keep her hands and feet warm." (R. at 323).

Plaintiff appeared for her appointment with Dr. Devashis A. Mitra, M.D., D.M.(Ph.D.) at the Mitra Arthritis and Osteoporosis Center, PC on May 6, 2010, (R. at 291-92). Here, Dr. Mitra noted that Plaintiff had Raynaud's phenomenon and pain in multiple joints, with her hands being the worst affected. (*Id*.). Testing also revealed that Plaintiff had a positive ANA[47]. (*Id*.). According to Plaintiff, she suffered from neck pain that worsened with movement and morning

---

[47] "An ANA test detects antinuclear antibodies in your blood. Your immune system normally makes antibodies to help you fight infection. In contrast, antinuclear antibodies often attack your body's own tissues — specifically targeting each cell's nucleus. In most cases, a positive ANA test indicates that your immune system has launched a misdirected attack on your own tissue — in other words, an autoimmune reaction. But some people have positive ANA tests even when they're healthy." Mayo Clinic, ANA Test, *available at* http://www.mayoclinic.com/health/ana-test/my00787.

stiffness lasting approximately 20-30 minutes. (*Id*.). Dr. Mitra noted that he had reviewed notes from Dr. Rocchi's office and incorporated them into Plaintiff's chart. (*Id*.). He diagnosed Plaintiff with joint pain involving multiple sites, Raynaud's Syndrome in her hands and feet, cervicalgia, and spasm of muscle. (R. at 292). In Dr. Mitra's opinion, "[c]linically, the patient has Raynaud's phenomenon besides polyarthralgias and a positive ANA." (*Id*.). However, despite Plaintiff's positive ANA, he believed that "she does not satisfy the ACR criteria for a connective tissue disease because she did not have any other clinical features to suggest one." (*Id*.). Dr. Mitra opined that "UCTD[48] is possible," recommending that Plaintiff undergo further evaluation with additional lab work, including a whole-body bone scan. (*Id*.). Dr. Mitra suggested that Plaintiff take Daypro[49] in 600 mg doses for arthritis symptom relief, and instructed her to return in 4-6 weeks. (*Id*.). Subsequently, on May 11, 2010, Plaintiff obtained the lab work that Dr. Mitra had ordered. (R. at 297-302). Plaintiff underwent a whole body bone scan on May 24, 2010, which was normal. (R. at 303; 357). Plaintiff followed up with Dr. Rocchi on May 27, 2010 to discuss her visit with Dr. Mitra. (R. at 319-21). Dr. Rocchi noted that Dr. Mitra had prescribed Daypro for Plaintiff's arthritis, but that Plaintiff "hasn't noticed much of a difference lately," and that she complained of joint pain and stiffness. (*Id*.). With respect to

---

[48]      Undifferentiated connective tissue disease (UCTD) is a systemic autoimmune disease. This means the body's natural immune system does not behave normally. Instead of serving to fight infections such as bacteria and viruses, the body's own immune system attacks itself. In UCTD, autoimmunity may cause the immune system to attack specific parts of the body resulting in a variety of problems. National Jewish Health, UCTD: Overview, *available at* http://www.nationaljewish.org/healthinfo/conditions/uctd/.

[49]      Daypro (Oxaprozin) is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis (arthritis caused by a breakdown of the lining of the joints) and rheumatoid arthritis (arthritis caused by swelling of the lining of the joints). Oxaprozin is also used to relieve pain, tenderness, swelling, and stiffness caused by juvenile rheumatoid arthritis in children 6 years of age and older. PubMed Health, Oxaprozin, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000919/.

Plaintiff's Raynaud's, Dr. Rocchi decided to add low dose Cardizem[50] "to see if it will help." (*Id.*). For her hypertension, he continued her on Avapro. (*Id.*).

When Plaintiff returned to Dr. Rocchi's office for a follow-up visit on June 8, 2010, she reported suffering from a sinus infection for the past five (5) to six (6) days. (R. at 316-18). At this point, she had been taking low dose Cardizem for about two (2) weeks, but had not noticed any improvement in her circulation, although she had no side effects except for some mild lightheadedness in the morning. (*Id.*). Dr. Rocchi diagnosed her with an acute maxillary sinusitis and prescribed Avelox for ten (10) days, instructing Plaintiff to follow up if she was not improving. (R. at 317). He noted that her hypertension and Raynaud's were both stable and continued the present management, instructing her to return in one (1) month. (*Id.*).

Two days later, Plaintiff returned to Dr. Mitra's office to follow up with his physician's assistant, Sara Mester, PA-C/D. (R. at 295). Ms. Mester indicated that Plaintiff suffered from a positive ANA with polyarthralgias, muscle spasm, sleep disturbance and Raynaud's, with "[d]iffuse arthralgias > myalgias." (*Id.*). She noted that these conditions were stable and that the intensity of pain remains unchanged. (*Id.*). According to Ms. Mester, "[m]ost notable" was "pain in the neck, low back and both hands with gelling effect often limiting mobility." (*Id.*). She described it as "moderate to severe" and "more weather than activity related with hand paresthesias and episodic left retro-orbital headaches." (*Id.*). However, Plaintiff denied joint swelling, radicular pain, and extremity weakness. (*Id.*). Ms. Mester wrote that Plaintiff suffered from "[s]ignificant general malaise affecting ADLs," and that she had been off work for four (4) months. (*Id.*). Ms. Mester noted that Plaintiff had biphasic Raynaud's in both hands and feet, a

---

[50]     Cardizem (Diltiazem) is used to treat high blood pressure and to control angina (chest pain). Diltiazem is in a class of medications called calcium-channel blockers. It works by relaxing the blood vessels so the heart does not have to pump as hard. It also increases the supply of blood and oxygen to the heart. PubMed Health, Diltiazem, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000815/.

possible sleep disturbance, "[n]ear syncopal episodes," allergic asthma which was controlled on weekly allergy desensitization injections, tachycardia, and chronic migraines which were stable. (*Id.*). She further wrote that Plaintiff had "[a]ctive Raynaud's both hands with hyperemia and cyanosis B toes" and a tender paraspinal spasm. (R. at 296). However, Plaintiff had no edema and her joints were non-tender without active inflammation; her conditions were noted as "stable albeit symptomatic." (*Id.*). Ms. Mester prescribed Plaintiff Robaxim 500 mg for her muscle spasm and Ativan for improved sleep, and otherwise continued her on her current medication regimen, instructing her to follow up with cardiology and "at UPMC" for "+ ANA/Raynaud's as scheduled," and ordered additional lab work. (*Id.*). She reviewed the case with Dr. Mitra and instructed Plaintiff to return in two (2) to three (3) months or sooner. (*Id.*).

On June 12, 2010, Plaintiff underwent an MRA of her abdomen, with and without contrast, which was ordered by Dr. Wolz after presenting with elevated blood pressure in order to rule out a possible obstruction. (R. at 275-76; 355-56). The results of this test indicated that there was no evidence for proximal or mid renal artery stenosis, but there was a possible mild stenosis of the mid to distal portion of the left renal artery[51], and the rest of the examination was unremarkable. (*Id.*). The same test was performed two days later, on June 14, 2010, for the same reasons, and the same results were collected. (R. at 277-78). Two days later, on June 16, 2010, Plaintiff visited Dr. Rocchi in order to receive allergy shots. (R. at 313-15).

On June 24, 2010, Plaintiff sought a second opinion from another rheumatologist, Dr. Robyn T. Domsic, M.D., MPH, to whom she was referred by Dr. Adelstein. (R. at 365; 371-98). At this visit, Dr. Domsic diagnosed Plaintiff with Raynaud's Syndrome, other unspecified immunological findings, headache, tachycardia, skin sensation disturbance, keratoconjunctivitis

---

[51]     Renovascular hypertension is high blood pressure due to narrowing of the arteries that carry blood to the kidneys. This condition is also called renal artery stenosis. PubMedHealth, Renovascular Hypertension, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001253/.

sicca, and periph vascular dis NEC. (R. at 371). Dr. Domsic remarked that when Plaintiff had seen Dr. Adelstein in early March of that year regarding her tachycardia, Dr. Adelstein noticed color changes in Plaintiff's hands, fatigue and other systemic symptoms, at which point he referred her to Dr. Domsic "for evaluation of an underlying autoimmune disease potentially contributing to her tachycardia." (R. at 372). Dr. Domsic noted that since then, Plaintiff had seen Dr. Mitra, but she did not have Dr. Mitra's records. (*Id*.). The results from Plaintiff's lab work included a positive ANA screen, negative SSA and SSB, Smith, RNP, double-stranded DNA, ASO titers, and a LAC panel, as well as a negative bone scan. (*Id*.). Dr. Domsic indicated that Plaintiff's heart problems seemed to have begun in 2008 and her hands began changing colors sometime in 2009. (*Id*.). Plaintiff reported that they are generally red, but sometimes will turn bluish, and Dr. Domsic found that there was not a distinct line in the fingers and the whole hand is often discolored, which worsens with cold, but can also occur in warmer temperatures. (*Id*.). As for Plaintiff's history of migraines, Dr. Domsic noted that they are generally worse with her menses. (*Id*.). She also indicated that Plaintiff's fatigue had lasted for approximately the last 18 months, remarking, "[i]nterestingly," Plaintiff "did restart allergy shots in early 2008 around the time the tachycardia and the fatigue began." (*Id*.). Dr. Domsic added that Plaintiff "was recently diagnosed with anemia and found to be B12 deficient, although a Schilling test has not been performed." (R. at 373). She was not aware of any other abnormal blood counts. (*Id*.). Plaintiff reported that she typically awakens with morning stiffness in her hands, lasting about 30 minutes, but that it generally gets better throughout the day, and she did not report any joint swelling. (*Id*.).

Dr. Domsic noted that Plaintiff "had worked with preschoolers, but now is no longer able to work secondary to her fatigue" (*Id*.). She noted that Plaintiff "does not exercise regularly, as

she is limited on the treadmill due to her fatigue and tachycardia." (*Id.*). Regarding Plaintiff's Raynaud's, Dr. Domsic opined that "although she does have color changes on her hands, the distribution she describes is actually more consistent with an acrocyanosis picture than true Raynaud, and she does have normal capillaries on exam today." (R. at 374). Suspecting that Plaintiff might have Sjogren's Syndrome[52], Dr. Domsic determined that she would like to "pursue a little bit further diagnostic workup for this," and ordered a formal dry eye exam as well as rheumatological work ups and a lip biopsy. (*Id.*). "[M]ost pertinent" to Dr. Domsic was to "proceed with a QSART test[53]," which she hoped would be done "sometime in the next 4 to 6 weeks." (*Id.*). Finally, Dr. Domsic asked Plaintiff to call her sometime in the next week to go over the lab results and to follow up at least once more, given Plaintiff's pre-existing relationship with Dr. Mitra. (*Id.*). She hoped that this workup would be completed prior to Plaintiff's follow-up with Dr. Adelstein later in the summer. (*Id.*). Following her appointment with Dr. Domsic, Plaintiff obtained the ordered lab work that day. (R. at 380-98).

Plaintiff did not return to Dr. Rocchi's office for approximately a month, until July 14, 2010, at which time she appeared for a follow-up visit and allergy injections. (R. at 310-12). Plaintiff complained of fatigue and lightheadedness. (*Id.*). Dr. Rocchi reported that Plaintiff was seeing "the rheumatologist at UPMC who told her she might have Sjogren's syndrome." (*Id.*). He added that Plaintiff had more blood work but had not heard any results yet. (*Id.*). He noted

---

[52]     Sjogren's syndrome is a disease that causes dryness in your mouth and eyes. It can also lead to dryness in other places that need moisture, such as your nose, throat and skin. Most people who get Sjogren's syndrome are older than 40. Nine of 10 are women. Sjogren's syndrome is sometimes linked to rheumatic problems such as rheumatoid arthritis. MedlinePlus, Sjogren's Syndrome, *available at* http://www.nlm.nih.gov/medlineplus/sjogrenssyndrome.html.

[53]     "The quantitative sudomotor axon reflex test (QSART) is used to assess the small nerve fibers, which are linked to the sweat glands… QSART is used to diagnose: painful, small fiber neuropathy when nerve conduction test results are normal; disturbances of the autonomic nervous system, which controls the sweat glands, heart, digestive system, other organs, and blood pressure; and complex pain disorders." Center for Peripheral Neuropathy, QSART,                         *available                                 at* http://peripheralneuropathycenter.uchicago.edu/learnaboutpn/evaluation/autonomic/qsart.shtml.

that she remained on Cardizem and Avapro for her hypertension and that she had had "a couple of episodes of tachycardia with a pulse as high as 120." (*Id*.). He diagnosed her with subconjunctival hemorrhage, a new problem, and indicated that observation was required "since this should resolve on its own." (*Id*.). He wrote that her hypertension was stable and that he was awaiting blood work from the rheumatologist with respect to her fatigue. (*Id*.).

Almost one month later, on August 12, 2010, Plaintiff returned to Dr. Mitra's office for continued care of positive ANA, polyarthralgias, Raynaud's phenomenon, and fatigue. (R. at 293). Dr. Mitra indicated that "[p]rior to this visit, [Plaintiff] also sought a second opinion from Dr. Robyn Domsic," who suggested the possibility of Sjogren's syndrome, "given the sicca symptoms the patient has been having." (*Id*.). However, testing revealed negative Sjogren's antibodies and all connective tissue disease workups were negative thus far, except for the positive ANA. (*Id*.). Nevertheless, Plaintiff's fatigue remained a "fairly substantial symptom besides the polyarthralgias" and she had "positive IgG antibodies to EBV." (*Id*.). Plaintiff reported experiencing morning stiffness lasting 30-40 minutes. (*Id*.).

In Dr. Mitra's opinion, Plaintiff did not satisfy the ACR criteria for a connective tissue disease, and "[a]t best, UCTD is a possibility given the positive ANA polyarthralgias and Raynaud's phenomenon." (R. at 294). He believed the fatigue was "mainly secondary to the EBV," and that "[g]iven the negative Sjogren's antibodies," he believed "this could be keratoconjuctivitis sicca[54]." (*Id*.). He wrote that she was to follow up "as needed." (*Id*.).

On August 25, 2010, Plaintiff followed up with Dr. Domsic regarding her initial evaluation on June 24. (R. at 365-70). At that point, Dr. Domsic determined that Plaintiff's presentation "had been one of episodes of sinus tachycardia, increasing fatigue for the last 2

---

[54]    Also called dry eye syndrome, this "is when the eye is unable to maintain a healthy layer of tears to coat it." PubMed Health, Dry Eye Syndrome, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001462/.

years, positive ANA, and acrocyanosis." (*Id.*). Further, they "discussed further evaluation for Sjogren disease as well as [a] QSART test to evaluate for autonomic dysfunction." (*Id.*). Plaintiff's lab work showed a positive ANA titer of 1:320 with a homogenous pattern, although complements were normal. (*Id.*). However, on gammaglobulin testing, Plaintiff's gammaglobulins were elevated, although she had negative thyroid antibodies and her Vitamin D was "low normal at 35." (*Id.*). Plaintiff had a negative lupus anticoagulant and anticardiolipin antibody profile as well as beta-2-glycoprotein. (*Id.*). Dr. Domsic referred Plaintiff for a formal dry eye exam, but was unable to schedule an appointment for her to see the opthomologist until September 24, 2010. (*Id.*). Dr. Domsic remarked that "there seems to have been some bit of mid confusion," as Plaintiff's QSART test was ordered but not scheduled. (*Id.*). That day, she noted that Plaintiff's disability hearing was scheduled for the end of September, and thus, "her workup certainly needs to be expedited." (*Id.*). She reported that "there really is not much change" in terms of how Plaintiff was feeling. (R. at 366). Plaintiff continued to have "some tachycardia," the majority of which she did not sense, although she "on a few occasions actually felt her heart racing." (*Id.*). Plaintiff had continued to receive allergy shots and her heart rate did not increase afterwards. (*Id.*).

Dr. Domsic stated that Plaintiff "still continues to have significant issues with fatigue." (*Id.*). She indicated that Plaintiff experienced morning stiffness in her hands and that "it can take an hour or so to loosen up, which was "a bit more than she reported at her last visit." (*Id.*). However, she did not note any joint swelling or redness, and there was no rash or ulcers. (*Id.*). Upon examination, Dr. Domsic found that although Plaintiff's pulse was recorded at 92, it "actually races between 100 and 110." (*Id.*). Her impression was that Plaintiff had a positive ANA, fatigue, and tachycardia, which was not clearly positional in nature. (*Id.*). Her differential

diagnosis "from an autoimmune standpoint still primarily includes Sjogren potential autonomic dysfunction." (*Id*.). Finally, Dr. Domsic's current recommendations remained the same as in June. (*Id*.). Plaintiff was still set to have her formal eye exam in September, as scheduled. (*Id*.). She scheduled her QSART test for September 16, 2010, which had been set "as quickly as possible given her upcoming disability hearing at the end of September." (*Id*.). Dr. Domsic noted that a lip biopsy was the "gold standard for diagnosis of Sjogren's," and gave Plaintiff an order for one and referred her to several dentists who could perform the procedure, pending approval of her insurance. (*Id*.). Dr. Domsic concluded her notes from this visit by stating that she "would like to regroup" with Plaintiff and that she was "happy to fill out any paperwork for her upcoming hearing, particularly when her results are back." (*Id*.). Otherwise, she planned to see Plaintiff in six (6) weeks for a follow-up appointment. (*Id*.).

On September 2, 2010, Plaintiff saw Dr. Melissa DeRenzo, M.D. at the Balouris Eye Center, P.C. for the dry eye exam in order to test for Sjogren's. (R. at 407-09). Dr. DeRenzo's impression was that Plaintiff had an autoimmune disease, and she prepared a letter for Dr. Domsic. (R at 408). On September 8, 2010, a biopsy of Plaintiff's lip was performed by Dr. Eric Smiga, M.D. at Kahn, Trop, Eichner, and Smiga; Associates in Oral and Maxillofacial Surgery, P.C. in order to evaluate Plaintiff for Sjogren's Syndrome. (R. at 402-06). However, Dr. Smiga found that Plaintiff's results were not supportive of Sjogren Syndrome, although there was "a diffuse mild chronic inflammatory infiltrate of lymphocytes and plasma cells." (R. at 402-03).

On September 16, 2010, Plaintiff went through additional testing by Dr. George A. Small, M.D. for her Raynaud's at Allegheny General Hospital so as to be "worked up for collagen vascular diseases." (R. at 410-11). He found that her results "fall within the low, but normal range for the patient's age, sex, and location of electrodes," and thus, "[t]he electrical

findings did not reveal evidence of a small fiber neuropathy." (*Id*.). Dr. Small noted that Plaintiff was "sent for autonomic testing," but "[u]nfortunately," she was "unable to stop her Cardizem and her angiotensin receptor blocking agent." (R. at 411). Her heart rate was indicative of normal cardiovagal function, and the electrical findings did not support evidence for an autonomic nerve problem. (*Id*.).

On October 27, 2010, Dr. Domsic wrote to Plaintiff's counsel, Katrine Erie, Esquire, regarding her symptoms. (R. at 412). In this letter, Dr. Domsic stated that she had evaluated Plaintiff on two occasions since June 2010 "for her symptoms of fatigue, tachycardia, subjective dry eyes, headaches, acrocyanosis and mild hand discomfort." (*Id*.). She reiterated that the pertinent test results were negative, and that "[a]t the current time, Ms. Raisley does not fit well into any of the classification criteria for the autoimmune illness." (*Id*.). Dr. Domsic opined that it was possible that Plaintiff had "an undifferentiated connective tissue disease which is currently in evolution," but that "[w]ithout a specific diagnosis of an underlying autoimmune illness, it is quite difficult to evaluate her long term function and work capacity." (*Id*.). However, she urged Ms. Erie to contact her if she could be of any further assistance. (*Id*.).

On November 23, 2010, Plaintiff returned to see Dr. Domsic for a follow-up examination, accompanied by her mother. (R. at 413). Dr. Domsic reported that she had spoken to Plaintiff in October regarding her QSART results and lip biopsy and that at that point, she was undergoing repeat evaluations by her PCP. (*Id*.). Dr. Domsic added that Plaintiff "also had just switched over to Verapamil," but that it caused her to have "terrible headaches and [she]could not tolerate the medication." (*Id*.). Plaintiff reported that she went back to the Cardizem and was seeing her cardiologist in December. (*Id*.). She reported being "more fatigued over the last several months." (*Id*.).

Dr. Domsic remarked that the labs ordered by Dr. Rocchi showed "elevated free metanephrines," although they were normal at the time she tested them in June. (*Id*.). Plaintiff complained of "increased flushing episodes where she feels that she is on fire," and that her hands were "always red" and felt cold, though she had no burning to suggest erythromelalgia nor did she notice any blanching, although there was a purplish hue with cold exposure. (*Id*.). Since Plaintiff's hands "feel stiff all day long," Dr. Domsic found that it was difficult "to discern if worse in morning as symptoms that are constant." (*Id*.). However, Plaintiff's QSART and lip biopsy were negative. (*Id*.). To Dr. Domsic, it did not appear that Plaintiff had Sjogren's disease or an evident underlying autoimmune illness. (R. at 414). Dr. Domsic opined that "[a]t most, she may have an undifferentiated connective tissue disease given the vague hand symptoms which sound inflammatory." (*Id*.). Although it was "[d]ifficult to link a positive ANA and tachycardia at this time," Dr. Domsic believed that "[c]ertainly with a positive ANA she may be at risk to later develop additional symptoms more suggestive of a connective tissue disease" and thought that Plaintiff "should be watched over the next few years." (*Id*.). She added that "[i]t may be reasonable to try a Medrol Dosepak or six month trial of Plaquenil for fatigue and hand pain," but "with elevated free normetanephrines," she though that "it is reasonable to have a second opinion regarding an endocrine evaluation." (*Id*.). Dr. Domsic referred Plaintiff to Dr. Hodak for an evaluation, "given fluctuating blood pressures, increased flushing and elevated normetanephrines," and she planned to check Plaintiff's CBC, although her symptoms were "not entirely consistent with erythromelalgia." (*Id*.). Dr. Domsic prescribed Plaintiff a six-day course of steroids to see if her hand pain improved, and asked her to call the following week and return in about three months. (R. at 414-15). Blood work performed that day, consisting of CBC and Diff INC platelet, was abnormal. (R. at 418-19).

### C. Functional Capacity

There is no medical source statement from a treating or examining physician, and thus the sole residual functional capacity assessment in the record is by a doctor for the Administration. On March 22, 2010, Dr. Dilip S. Kar, M.D., a state agency physician, reviewed Plaintiff's file, which consisted of office notes from Dr. Rocchi dated December 28, 2009; January 9, 2010; January 27, 2010; and March 9, 2010. (R. at 262-70).

According to Dr. Kar, Plaintiff was capable of occasionally lifting up to twenty (20) lbs. and frequently lifting up to ten (10) lbs, with no limitations with respect to pushing and pulling operations. (R. at 263). Further, Dr. Kar opined that Plaintiff could stand or walk and could sit for a total of about six (6) hours out of an eight (8) hour workday. (*Id.*). Dr. Kar found no postural limitations, manipulative limitations, visual limitations, or communicative limitations. (R. at 264-65). However, he did find that Plaintiff suffered from certain environmental limitations. (R. at 265). Specifically, he determined that she must avoid concentrated exposure to extreme cold and wetness, and that she must avoid all exposure to hazards, including machinery and heights, as a result of her Raynaud's and migraines. (*Id.*).

Based on his review of Plaintiff's file, Dr. Kar concluded that she suffered from medically determinable impairments of migraines, MVP, HTN, Raynaud's, and arthritis. (R. at 262, 266-67). Dr. Kar opined that Plaintiff had described daily activities that were not significantly limited, was able to relate "fairly well to others," and could drive a car. (R. at 270). Further, she did not require an ambulatory device and had received treatment "from a specialist for her Migraine and MVP." (*Id.*). Dr. Kar noted that Plaintiff's medical history was "[o]f critical importance" in determining her credibility regarding her symptoms and their effects on her

functioning, as well as the character of her symptoms and her ADLs. (*Id*.). He found Plaintiff to be partially credible. (*Id*.).

A disability examiner, Jeanine Solo, analyzed Plaintiff's vocational factors and determined that at thirty-two (32) years old, having sixteen (16) years of education, Plaintiff could perform her past relevant work as a secretary/bookkeeper/clerk. (R. at 26-27). She claimed to have considered Plaintiff's restrictions with respect to her exertional and non-exertional limitations. (*Id*.).

### D. Administrative Hearing

A hearing regarding Plaintiff's claims was held before Administrative Law Judge James Pileggi on September 24, 2010 at the Office of Disability Adjudication and Review in Seven Fields, Pennsylvania. (R. at 430). Plaintiff appeared to testify, accompanied by her attorney, Katrine M. Erie, Esquire. (R. at 431).[55] Dr. William H. Reed, Ph.D., an impartial vocational expert ("VE"), also appeared and testified. (R. at 12; 430).

Plaintiff testified that she was thirty-two (32) years old, having a birth date of December 28, 1977. (R. at 437). She was single and did not have any minor children living with her. (*Id*.). She denied currently receiving any kind of governmental benefit or income at any time since January 2009. (*Id*.). The ALJ noted that Plaintiff's date last insured was June 30, 2010, but at that point it was "only a couple of months ago and… won't really have any effect one way or the other on this case." (R. at 439). The ALJ cited to Plaintiff's April 9, 2009 office visit with Dr.

---

[55]      Initially, the ALJ instructed Plaintiff's counsel to call Allegheny General Hospital regarding additional testing that had been ordered by Dr. Domsic because he could not "hold the case open indefinitely..." (R. at 434). However, he stated that he would hold the record open for thirty (30) days "to start off" because he believed that obtaining a specific connective tissue disease diagnosis was "a lynchpin" of Plaintiff's case, since she suffered from "a lot of subject[ive] complaints… which cannot be easily objectively measured by headaches, weakness, joint pain, various things of that nature…" (R. at 434-35). He informed Plaintiff and her counsel that if thirty (30) days was "an "insufficient amount of time," he would "consider holding the case open for a somewhat longer period of time…" (*Id*.).

Rocchi and asked if she would be amenable to amending her disability onset date to that day, to which her counsel agreed. (*Id.*).

Next, Plaintiff described the circumstances of her leaving her last job as a daycare teacher in late 2008, at which time she "started slowing down" because she "just… couldn't keep up," at which point she asked her employer "for a cutback in hours." (R. at 438). Thereafter, she further reduced her hours from about thirty-five (35) hours per week to approximately eighteen (18) hours per week, until she eventually stopped working completely on January 22, 2010, a day when she worked a ten (10) hour shift and then "pretty much collapsed afterwards." (R. at 440). Plaintiff testified that prior to working as a daycare teacher, she was employed as a secretary, a bookkeeper, and a cemetery salesperson, which required her to meet with customers in the office as well as in their homes. (R. at 441).

Although she testified that she did have her driver's license and did not have any medical conditions preventing her from safely operating a motor vehicle on a regular basis, she said that "sometimes I feel that I can't operate the car safely[,] so then I'll let my mom drive." (R. at 441-42). She denied having any mental emotional problems. (R. at 442). Plaintiff stated that she's had headaches "for years and years," typically around her "time of the month," but that they became more frequent beginning in the fall of 2008 and into 2009, at which point she was "getting them pretty much on a day-to-day basis." (*Id.*). For relief, she would take "up to 18 Imitrex a month," until her doctor advised her against that. (*Id.*). Although she admitted that she no longer had migraines on a daily basis, she testified that she still had them about four (4) days each month, during the time of her menstrual period, at which point she takes Imitrex "every day during that time." (R. at 442-43). Plaintiff felt that Imitrex was the only medicine able to "stabilize" and relieve her headaches, as long as she took it within fifteen (15) to twenty (20)

minutes of onset. (R. at 443). However, if she did not take it within "that time window," she would be "pretty much done for," meaning that she would begin to vomit and her headache could last for days, although she did not feel that it would prevent her from going about her "daily duties." (R. at 443-44).

Next, the ALJ inquired into the other symptoms that Plaintiff was experiencing. With respect to her heart problems, Plaintiff testified that on September 16, 2010, she had seen a physician at Allegheny General Hospital when she underwent her QSART test, who had advised her to obtain "a more in-depth screening" of her vascular system "because he said that there was something definitely wrong" with her and that her circulation was "very bad," which she interpreted as a general statement regarding her medical condition. (R. at 444-45). The ALJ asked if she was "going to talk to a doctor about having a further investigation," and Plaintiff answered that she was planning to talk to her cardiologist, Dr. Wolz, but that she did not have an appointment set up, as it was "kind of on an as-needed basis." (R. at 445). As for her hypertension, Plaintiff testified that she took Avapro to control her blood pressure, which she felt generally worked, although she "still had very high [blood pressure] readings." (R. at 446).

Moving on, the ALJ asked if doctors had attributed Plaintiff's "aches and pains and various things of that nature" to her Raynaud's Syndrome. (*Id.*). According to Plaintiff, Dr. Rocchi and other doctors she had seen regarding her Raynaud's had done so, but at her visit with Dr. Domsic in June, Dr. Domsic had opined that Plaintiff might not actually have Raynaud's. (R. at 446-47). Plaintiff stated that her hands and feet "can turn really dark," going from "a dark red shade[,] depending on different temperatures and things," to "purple." (R. at 447). There was "one instance in the spring" when her feet had turned black, but by the time she saw Dr. Rocchi, they were "still discolored, but not black." (*Id.*). Dr. Rocchi advised her that she was doing the

right thing by covering herself in blankets to warm her body up, since her body temperature "can get so low." (R. at 447-48).

As for her fatigue, Plaintiff testified that she suffers from joint pain and stiffness on a daily basis, particularly in her hands and fingers, which she tried to alleviate by doing flexing exercises "all the time." (R. at 448-49). She found that if she sat too long, her feet would swell and sometimes change color. (*Id*.). When she felt that they were "getting numb," she would "have to get up and move around." (*Id*.). Plaintiff denied having dry eyes, but testified that her throat was frequently dry, which was why she had undergone the dry eye test earlier that September. (*Id*.).

As for her outside activities, interests, and hobbies, Plaintiff testified that she no longer engaged in many because she no longer did "much other than going to the doctors." (R. at 448). She ate at a restaurant "a couple of times a month" with her mother and grandmother, and was able to shop at the grocery store and Walmart. (R. at 448-49). At this point, the ALJ asked Plaintiff: "What is it specifically about your condition that causes you to feel that you're incapable of work?" (R. at 449). Plaintiff answered that she gets "so tired and so wor[n] out very easily," and is often "completely wor[n] out from not doing anything" and simply sitting at her house. (*Id*.). Plaintiff speculated that the fatigue could be related to her medication, such as the Avapro, which was a "high dose" that, according to Dr. Wolz, could cause fatigue. (*Id*.). Plaintiff acknowledged that she was able to care for her own personal needs without assistance, but that when attempting to perform routine household chores, she sometimes did not finish due to becoming too fatigued or feeling hot or flushed from her blood pressure medicine. (R. at 450).[56]

---

[56] At this point, the ALJ ceased questioning Plaintiff and turned to her attorney, to whom he stated: "Well, Ms. Erie, you can question your client, but I consider her to be credible… I think she's a very credible witness, okay?" (*Id*.). However, "the problem," as he saw it, "is whether she has an underlying disease process," as he did not have evidence to a "sufficient extent to support the complaints…" (*Id*.). He remarked that Plaintiff no longer

On examination by her attorney, Plaintiff testified that she had been receiving B12 injections since that past April for her B12 deficiency anemia. (R. at 453-54). She stated that she had eight (8) weeks of consecutive shots, until around May 28, at which point she started receiving monthly shots, although Plaintiff did not believe that they had helped to relieve her fatigue. (R. at 454). She also received weekly allergy shots, which she had taken from the age of five (5) years old to age eighteen (18) when she decided to "try a period of time without getting shots… all the time," and "ended up having a good run of being without the shots up until about 2008," at which time she began to receive the shots again due to sinus headaches and back-to-back sinus infections. (*Id*.). She began to feel very tired around late 2008, although she was still able to work  "a lot of hours and have some energy…" (R. at 455). As for the way in which temperatures affected her, she testified that her hands and feet felt "as though they're on fire" in extreme heat, and that in the very cold weather, she was still cold despite dressing in numerous layers of clothing, including "special gloves with battery packs" and "layered socks and shoes." (*Id*.). In the cold, her hands and feet feel like they are burning, tingling, and going numb. (*Id*.).

---

suffered migraines on a daily basis, and that they were "down to[,] I think[,] very manageable levels," since she "only has them for a few days a month and if she takes her medication in time, she can still function despite the headache," and thus, "the migraines in and of themselves would not be sufficient… to establish a disability." (R. at 450-51).

In his opinion, the ALJ felt that what would "make her claim" was "the combination of symptoms – the migraines, the stiffness in the joints, the muscle fatigue… the overall fatigue and tiredness… and that has to be… supported by a basis for them." (R. at 451). Thus, he reiterated that he would leave the record open to give Plaintiff an opportunity "to find a basis for it," if she was "so inclined" to "get some opinion statements from the people [who] were treating her as to how significant her subjective complaints may be…" (*Id*.). He noted that there was "a certain degree of time constraint" regarding Plaintiff's claim, as "this has been going on for some time," and that it was "incumbent" upon Plaintiff to follow through with her doctors "in a timely manner," and although it was not always within her control, she should "press them." (R. at 451-52). Plaintiff's counsel added that Dr. Mitra and Dr. Domsic were "kind of at odds as to what the diagnosis is," which had resulted in Plaintiff being unsure of which doctor to see for treatment. (R. at 452).

The ALJ remarked that the name of a particular diagnosis did not matter to him, only that "we know that there is, in fact, an underlying disorder that accounts for her symptomatology…" (R. at 452-53). He added: "I'm not a physician so I can't go and pick and choose which one of these tests I think are important…" (R. at 453). Then, he permitted Plaintiff's counsel to question her. (*Id*.).

Plaintiff estimated that she could lift about five (5) lbs. with two hands, although she was capable of lifting a gallon of milk, which the ALJ stated was eight (8) lbs. (R. at 456). However, she wasn't sure because she didn't "do a whole lot of lifting in general." (R. at 457). She clarified that when she worked, she was occasionally required to lift a child weighing twenty (20) lbs., but that even before she could no longer lift that much weight at all, it "could be difficult and awkward" for her. (*Id.*). Plaintiff testified that she frequently dropped objects, which she thought was due to the circulation in her hands more than her lack of strength. (R. at 458).

Plaintiff testified that she generally did not watch a lot of TV, but that when she did, she typically needed to use the restroom or "get up and move around" during a commercial break because if she sat or stood too long, her feet would "look funny" to her or feel numb or "fat" or "thick," indicating that they were swelling. (R. at 458-59). She also moved her hands and fingers "all the time" so that she could "get the circulation in them and move them so that they're not stiff…" (*Id.*). She estimated that she would need to move around within 45 minutes. (*Id.*).

Plaintiff reported waking up around 8:30 or 9:00 a.m. each day, depending on whether she had an appointment that day. (R. at 460). She testified that she had not been sleeping well that past fall and through the spring, as she was "up pretty much all through the night," which Dr. Wolz had attributed to her rapid heart rate. (*Id.*). Plaintiff reported feeling groggy and tired even after seven (7) hours of sleep, and that sometimes she was "in a fog for the majority of the day," adding that "[i]t's an awful, awful feeling to just feel like you're out of it." (R. at 460-61).

She testified that she did suffer side effects to her medication, but that Dr. Wolz had informed her that she needed to be on Avapro, although it made her more fatigued, because her blood pressure was so high. (R. at 461). She reported suffering problems with her memory and concentration on days that she felt like she was "in a fog all day," such that she could not

remember spoken or written statements, and often could not remember where she had placed things. (R. at 462). She added that her employer had told her that her concentration and ability to complete tasks "was lacking." (*Id.*).

Subsequently, the ALJ asked the VE a number of hypothetical questions. (R. at 462-63). First, he asked the VE what the exertional and skill levels of Plaintiff's previous jobs were. (R. at 463). Plaintiff's work as a daycare group supervisor and a receptionist/cashier/stocker was both medium in exertional level and qualified as unskilled. (R. at 463). Her job as a secretary/bookkeeper/clerk was sedentary and semiskilled-to-skilled. (*Id.*). Her position as a will and estate planner and cemetery salesperson was also sedentary and "probably unskilled." (*Id.*). However, if she had to travel to customers, it would be light, not sedentary. (R. at 463-64).

For his first hypothetical question, the ALJ asked the VE to assume an individual who was thirty-two years of age with a college education and the work experience he had defined and described; who was capable of light work activity, but would not be able to be exposed to extreme heat, cold, or humidity; who would not be able to engage in the operation of foot controls or "constant gripping or grasping or manipulating with the hands," and whether this person would be capable of returning to any of these previous jobs. (R. at 464). Dr. Reed believed this person could return to both the cemetery job and the secretary/bookkeeper/clerk position. (*Id.*). The ALJ asked whether limited hand use would impede an individual acting as a secretary with respect engaging in "keyboarding and various things of that nature," but since these tasks were "not necessarily done on a constant basis," the VE felt that this person could still perform this past relevant work as described. (*Id.*).

Next, the ALJ asked what other light jobs such an individual could perform. (*Id.*). The VE testified that this person could do work as: (1) light, unskilled photocopying and other

business machine operations jobs, with approximately 87,000 jobs available; (2) light, unskilled security guards, with approximately 1 million jobs available during the relevant period, although typically this job would be semiskilled, it qualified as an exception to the rule in the DOT; and, (3) light, unskilled stock and inventory clerks, with approximately 81,000 jobs available. (R. at 464-65).

Third, the ALJ asked the VE: "If I were to reduce her to sedentary work with the same additional limitations that I previously described, she would still be capable of performing the sales and secretary jobs as you had originally described it, but not the sales job as she, in fact, performed it, is that correct?" (R. at 465). The VE confirmed that this was correct. (*Id*.).

Fourth, the ALJ asked if an individual who was unable to report for work or would have to be absent "on an irregular or random basis" three (3) or more times per month, and this went on for several months, would be able to do this or any other job in the national economy. (R. at 465-66). To this question, the VE responded that the answer was "No." (R. at 466).

Fifth, the ALJ asked if an individual who would be off task ten (10) to fifteen (15) percent of the workday for an extended period of time, excluding the usually scheduled work breaks and lunch period, would be able to do these or any other jobs in the national economy. (R. at 466). The VE answered that he did not believe there were any jobs for a person off task fifteen (15) percent of the time or more. (*Id*.).

Finally, the ALJ asked Plaintiff's counsel if she wished to question the VE, but she did not. (*Id*.). After a brief closing statement by Ms. Erie, the ALJ reiterated that he would leave the record open for thirty (30) days and that if more time was needed, counsel should "contact my office and I'll extend that period of time." (R. at 467). He added that he would be looking for test

results and additional evidence from Plaintiff's treating doctors that she might wish to submit within that timeframe. (*Id.*).

## IV.    STANDARD OF REVIEW

To be eligible for disability benefits under the Act, a claimant must demonstrate to the Commissioner that she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment, which has lasted or can be expected to last for a continuous period of at least twelve months, or which can be expected to result in death. 42 U.S.C. § 423(d)(1)(A); *Brewster v. Heckler*, 786 F.2d 581, 583 (3d Cir. 1986). To determine whether a claimant has met the requirements for disability, the Commissioner must utilize a five-step sequential analysis in reviewing the claim. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x. 1; (4) whether the claimant's impairments prevent her from performing past relevant work; and (5) if the claimant is incapable of performing her past relevant work, whether she can perform any other work which exists in the national economy. 20 C.F.R. § 404.1520(a) (4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume past relevant work, the burden shifts to the Commissioner at Step Five to prove that, given the claimant's mental or physical limitations, age, education, and work experience, she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[57], 1383(c)(3)[58]; *Schaudeck v. Comm'r Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. § 706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir.1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390.

When considering a case, a district court cannot conduct a *de novo* review, nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196-97. Further, "even where this court acting *de novo* might have reached a different conclusion… so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory

---

[57]   Section 405(g) provides in pertinent part: "Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action… brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business." 42 U.S.C. § 405(g).

[58]   Section 1383(c)(3) provides in pertinent part: "The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title." 42 U.S.C. § 1383(c)(3).

interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1191 (3d Cir. 1986).

## V.    DISCUSSION

In his December 23, 2010 decision, the ALJ concluded that Plaintiff had not been under a disability within the meaning of the Act from the time of April 9, 2009[59], Plaintiff's alleged onset date, through the date of his decision.  (R. at 20).

In his decision, the ALJ found that Plaintiff's migraine headaches, mitral valve prolapse, hypertension, and Raynaud's syndrome were medically determinable severe impairments (20 C.F.R. §§ 404.1520(c) and 416.920(c)). (R. at 14).[60] Plaintiff contends that the ALJ erred in his evaluation of Plaintiff's RFC because he did not include all of her impairments and that he likewise erred in his questions to the VE because he did not include the results of these impairments. (*Id*. at 17). Further, she argues that the ALJ erred in finding that there are a significant number of jobs in the national economy that Plaintiff is capable of performing since he relied on the VE's testimony, which was in response to "a flawed hypothetical." (*Id*.). Finally, she alleges that the ALJ erred in finding that Plaintiff is capable of performing her past relevant

---

[59]     Plaintiff satisfied Step One of the determination because she had not engaged in substantial gainful activity since April 9, 2009, the amended alleged onset date (20 C.F.R. §§ 404.1571, *et seq*. and 416.971, *et seq*.). (R. at 14). Although she had worked part time as a daycare teacher until January 2010, her earnings from this period were insufficient to meet the Administration's definition of substantial gainful activity. (*Id*.).

[60]     Plaintiff argues that the ALJ's decision is not supported by substantial evidence because he did not find that Plaintiff's additional impairments were "severe," nor did he explain his reasoning behind this determination. (Docket No. 18 at 16-17). However, this Court concurs with Defendant to the extent that this allegation is insufficient to support vacating the ALJ's decision. Had the ALJ failed to identify any severe impairment, this Court would agree that such grounds justify remanding the case and proceed no further than Step Two in the sequential analysis. *See McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360-61 (3d Cir. 2004) (since step-two inquiry is *de minimis* screening device to dispose of groundless claims and is rarely utilized as basis for denial of benefits, Commissioner's determination to deny an applicant's request for benefits at step two should be reviewed with close scrutiny) (citing *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546-47 (3d Cir. 2003)). However, the ALJ did identify a number of impairments he determined were severe, and any error committed at this point cannot be said to constitute reversible error, as it had no effect on the outcome of the analysis. Further, although her records consistently indicate that Plaintiff suffers from fatigue, no actual diagnosis of Chronic Fatigue Syndrome has been rendered, as Plaintiff alleges. (*See* Docket No. 18 at 19) (citing R. at 291-92, 294-302; 339, 346). The flaw lies in the ALJ's RFC assessment of Plaintiff. Thus, it is Plaintiff's second argument with which this Court concurs.

work as a cemetery salesperson or secretary/bookkeeper because his decision was based on a "a flawed analysis of the law, the facts, and the failed analysis of his own RFC." (*Id.*). Defendant responds that Plaintiff's first three arguments are "overlapping" and are "all similarly without merit." (Docket No. 20 at 9). He further maintains that it was within the ALJ's discretion to deny Plaintiff a consultative examination, as well as in making his RFC assessment. (*Id.* at 14-15).

While this Court concurs with Defendant that the ALJ's determination at Step Two did not affect the outcome of his analysis, it disagrees with Defendant's contention that the rest of her arguments are meritless.

In his decision, the ALJ remarked that Plaintiff "has been tested for Sjogren's syndrome and autoimmune disorders but test results were negative," and that although Dr. Domsic speculated that Plaintiff might have a connective tissue disease, no diagnosis was confirmed. (R. at 14-15) (citing Exhibit 17F). However, beyond his cursory mention of Plaintiff's migraines, cardiovascular involvement, including mitral valve prolapse, hypertension, and Raynaud's syndrome as the impairments that he considered in making this determination, along with his identification of the Listings, he fails to explain his reasoning for his decision. Specifically, the ALJ says that he considered Plaintiff's migraine headaches, but concluded that there was no evidence that her migraines met or equaled a Listing under Sections 4.00 (*Cardiovascular System*), 11.00 (*Neurological System*), or 12.02 (*organic mental disorders*). (*Id.*) (citing Exhibits 2F, 4F, 11F, 12F, and 14 F). He noted Plaintiff's "history of cardiovascular involvement, including mitral valve prolapse," but found that the evidence did not establish that she had a condition which would fulfill the requirements contained in any of the cardiovascular listings, including 4.01 (*chronic heart failure*) and 4.05 (*recurrent arrhythmias*). (*Id.*) (citing Exhibits 1F, 3F, 4F, 5F, 6F, 8F, and 13F). With respect to Plaintiff's hypertension, he determined that no

evidence showed that it affected her other body systems to a disabling degree, and therefore concluded that it failed to meet a Listing under Section 4.00. (*Id*.) (citing Exhibits 4F, 5F, and 8F). As for her Raynaud's syndrome, evaluated under the criteria set forth under Listing 14.00 (*Immune System Disorders*), he found that Plaintiff could not meet the criteria under Listings 14.02 or 14.04, as she did not need an assistive device to ambulate and could perform fine and gross movements effectively. (*Id*.). [61]

At this point, the ALJ concluded that Plaintiff retained the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), "except that she must not be exposed to extremes of heat, cold or humidity; she would not be able to engage in the operation of foot controls; and she would not be able to engage in constant gripping or grasping or manipulating with the hands." (R. at 15-16). He claims to have carefully considered the evidence in finding that her medically determinable impairments could reasonably be expected to cause her alleged symptoms but her statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent that they were inconsistent with his RFC assessment. (R. at 16). Further, the ALJ indicates that he considered "the subjective factors in this case" pursuant to 20 C.F.R. 416.929 and SSR 96-7p, but that the preponderance of the evidence failed to substantiate the severity of Plaintiff's allegations. (*Id*.). Here, he states that "it is not so much that claimant was not credible in her testimony, but that the functional limitations she identified as resulting from her impairments are not of the severity that would substantiate a finding that claimant is disabled from engaging in substantial gainful activity within the parameters of the residual functional capacity detailed above." (R. at 17).

---

[61] Plaintiff does not dispute the ALJ's determination at Step Three that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520, 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). (*See* R. at 15).

However, this Court notes that at Plaintiff's hearing, the ALJ specifically opined that Plaintiff was "a very credible witness." (*See* R. at 450). Notwithstanding Plaintiff's arguments regarding the ALJ's refusal to permit Plaintiff to obtain a consultative examination, despite the fact that she did not receive one previously and although counsel did make a timely request within the thirty (30) day period, the ALJ states that he attributed "significant weight" to the opinion of state agency physician, Dr. Dilip S. Kar. (*Id.*). Irrespective of the ALJ's decision to rely almost exclusively on this opinion, without an explanation of his reasoning for rejecting the objective medical evidence in Plaintiff's file, the ALJ failed to include a specific limitation that was identified by Dr. Kar in his questions to the vocational expert. Thus, it is this Court's opinion that the ALJ clearly erred at Steps Four and Five of his analysis.

"Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359, *fn.*1 (3d Cir. 1999)); *see also* 20 C.F.R. § 404.1545(a). "An ALJ must consider all relevant evidence when determining an individual's RFC." 20 C.F.R. § 404.1545(a); *Burnett*, 220 F.3d at 121. This evidence includes "medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others." *Fargnoli v. Halter*, 247 F.3d 34, 41 (3d Cir. 2001). An individual claimant's residual functional capacity is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. § 416.927(c)(2). The ALJ's finding of residual functional capacity must be "accompanied by a clear and satisfactory explication of the basis on which it is based." *Fargnoli*, 247 F.3d at 41 (quoting *Cotter v. Harris*, 642 F.2d 700 (3d Cir. 1981)).

The United States Court of Appeals for the Third Circuit has held that "[t]he ALJ has a duty to hear and evaluate all relevant evidence in order to determine whether an applicant is entitled to disability benefits." *Cotter*, 642 F.2d at 704. "Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence he rejects and his reason(s) for discounting that evidence." *Fargnoli* at 43. He must make enough factual findings so that the reviewing court has the ability to determine if "significant probative evidence was not credited or simply ignored." *Id*. at 42.

Here, the ALJ took into account Plaintiff's ability to "mostly complete her activities of daily living," but seems to have mischaracterized the evidence of what these activities consist. Namely, Plaintiff alleged that she can prepare her own breakfast and lunch, but they must be simple meals that take less than ten (10) minutes to make, and that she attempts to complete household chores but is unable to do so because of exertion and fatigue. (*See* R. at 77; 102; 110). The ALJ's misconstruction of the evidence is further apparent based on his conclusion that her part-time work as a daycare teacher until January 2010 shows her "capacity to engage in some form of work activity." (R. at 17). As the ALJ himself points out, this work was "not performed at a level consistent with [the Administration's] definition of substantial gainful activity," and further, Plaintiff claims that she stopped working because of the alleged limitations arising from her conditions. (*See* R. at 73; 81; 439-41).

Moreover, at her June 24, 2010 appointment with Dr. Robyn T. Domsic, M.D., MPH, a treating physician, Dr. Domsic reported that Plaintiff was no longer able to work due to her fatigue. (*See* R. at 373). When Plaintiff followed up with Dr. Domsic on August 25, 2010, Dr. Domsic noted that Plaintiff's lab work should "certainly" be expedited in light of her upcoming disability hearing at the end of September, as Plaintiff "still continues to have significant issues

with fatigue." (*See* R. at 365-70). Moreover, at that appointment, Plaintiff reported experiencing up to one (1) hour of morning stiffness daily, and Dr. Domsic found that her pulse "actually races between 100 and 110," despite registering as 92. (*Id.*). Additionally, while Plaintiff did state that she "only experiences about four headaches per month, coetaneous with her menses" and that Imitrex helped to alleviate her symptoms, the ALJ disregards her testimony that this was contingent on her taking Imitrex within a fifteen (15) to twenty (20) minute time frame, or else she would become ill and vomit, resulting in a headache that could last for days. (*See* R. at 443-44). Thus, his conclusion is irreconcilable with the VE's answer that a person who would need to be absent "on an irregular or random basis" three (3) or more times per month could not perform any work in the national economy. (*See* R. at 465-66).

Although as a general matter, treating and examining physicians' opinions are weighed greater than the opinions of doctors who review records, the ALJ was entitled to rely on Dr. Kar's physical residual capacity assessment of Plaintiff in support of his decision. *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). However, the problem lies in the fact that he failed to apply the environmental limitations established in the state agency physician's RFC assessment by not including them in the hypothetical question to the vocational expert. Since the ALJ's findings that Plaintiff was capable of performing her past relevant work as a cemetery salesperson or secretary/bookkeeper as well as other jobs in the national economy were "based on the hearing testimony of the vocational expert" (*see* R. at 19), this Court agrees with Plaintiff that the ALJ erred at Steps Four and Five of the analysis.

"[A] vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments." *Podedworny v.*

*Harris*, 745 F.2d 210, 218 (3d Cir. 1984). In his own written decision, the ALJ explains that he attributed "significant weight" to the opinion of the state physician, Dr. Dilip S. Kar, M.D. (*See* R. at 18). Namely, Dr. Kar opined that Plaintiff "must avoid concentrated exposure to extreme cold and wetness, and *must avoid all exposure to hazards such as machinery and heights*." (*See* R. at ) (emphasis added). In his decision, the ALJ does state that Plaintiff must avoid all exposure to hazards such as machinery and heights. (R. at 18). Yet, the ALJ failed to account for this limitation in the hypothetical question he posed to the VE. (*See* R. at 34-37). This Court finds that the ALJ's failure to consider all of Plaintiff's impairments and to include the limitations posed by these impairments in his questions to the vocational expert was error and constitutes adequate grounds for a remand.

"A district court, after reviewing the decision of the Commissioner may under 42 U.S.C. § 405(g) affirm, modify, or reverse the Commissioner's decision with or without a remand to the Commissioner for a rehearing." *Newell*, 347 F.3d at 549 (citing *Podedworny*, 745 F.2d at 221). On remand, the ALJ is directed to reopen and fully develop the record. *See Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 798, 800 (3d Cir. 2010). This requires, at a minimum, that the ALJ allow the parties to be heard via submissions. *Id*. This Court reminds Plaintiff that she bears the burden to produce evidence in support of her disability claim. 20 C.F.R. § 404.1512; *Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005).

## VI.    CONCLUSION

Based on the foregoing, the decision of the ALJ is not adequately supported by substantial evidence from Plaintiff's record within the meaning of 42 U.S.C. § 405(g). Therefore, Defendant's Motion for Summary Judgment [19] is DENIED, and Plaintiff's Motion for Summary Judgment [17] is GRANTED to the extent that she seeks a vacation of the

administrative decision under review, and the case is REMANDED for further proceedings.[62] An

appropriate Order follows.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date:  February 5, 2013

cc/ecf:  All counsel of record.

---

[62] The ALJ is directed to reopen the record and allow the parties to be heard via submissions or otherwise as to the issue addressed in this Memorandum Opinion. *See* Thomas, 625 F.3d at 800-01. He must consider and make specific findings regarding all of the relevant medical evidence and weigh that evidence. *See Fargnoli*, 247 F.3d at 44. To the extent that the ALJ reaches a contradictory finding to that of Plaintiff's treating and consultative examiners, "he must explain the reasoning behind such a finding, including reconciling conflicts and discussing how and why probative evidence supporting Plaintiff's claim was discounted and/or rejected." *Id.*